# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>TERRY TAYLOR<br>aka TERRY THOMAS<br><br>*Defendant(s)* | )<br>)<br>)   Case No.  15-8310-DLB<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __June 4, 2015__ in the county of __Palm Beach__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1), (b)(1)(A)<br>18 U.S.C. § 922(g) | Possession with intent to distribute a mixture or substance containing a detectable amount of heroin, a controlled substance, and conspiracy to possess a mixture or substance containing a detectable amount of heroin, of at least one kilogram in weight |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Christian Malta,  DEA TFO
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  6-9-2015

_____
*Judge's signature*

City and state:  West Palm Beach, Florida      United States Magistrate Judge Dave Brannon
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Christian Malta, being first duly sworn, hereby depose and state as follows:

1. I am a deputized Task Force Officer with the United States Drug Enforcement Administration (DEA). As such, I am a law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7), who is empowered to conduct criminal investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516, to include offenses arising under Titles 18 and 21 of the United States Code.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is based upon my own knowledge, as well as information provided to me by other law enforcement officers. This affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint. As a consequence, it does not purport to detail everything known about this case to your affiant or law enforcement.

3. Since approximately November 2014, members of the West Palm Beach Police Department's (WPBPD) Anti-Crime Unit began a narcotic investigation at 4635 Portofino Way, unit 112, West Palm Beach, Florida. Agents from the WPBPD's Anti-Crime Unit, received an anonymous tip stating that the occupant(s) from 4625 Portofino Way, unit 112, were involved in dealing narcotics. Over the next several months, members of the WPBPD's Anti-Crime Unit, ("agents") conducted surveillance and trash pulls from 4635 Portofino Way, unit 112.

4. On November 15, 2014, at approximately 1:00 p.m., an agent (Agent #1) was conducting surveillance at 4635 Portofino Way, unit 112, and noticed a white trash bag that was placed in the trash container, just east of the unit door to 4635 Portofino Way, unit 112.

Agent #1 then notified Agent #2 of the Anti-Crime Unit and instructed him to conduct an investigative trash pull from 4635 Portofino Way, unit 112. It should be noted that the management to the complex implemented a trash removal service, which removes trash from each individual unit's trash bin, located next to each of their respective doors. Upon arrival to the complex, Agent #2 grabbed the trash bag from unit 112 and walked directly to Agent#1's unmarked police vehicle. This bag was sealed in a knot with a red string, not allowing any of the contents to be removed. Agent #1 assumed custody of the white trash bag and drove to a secure location to view the contents from within. At that location, Agent #1 opened the top knot of the trash bag and began looking through the contents. The items recovered from the bag are as follows: (2) two red plastic cups with suspected heroin residue, (1) one sheet of aluminum foil with suspected heroin residue, (4) four clear washed Ziploc bags, (3) three wax paper sheets with suspected heroin residue and (8) eight clear plastic baggies with unknown white powder residue. The residue and white powdery substance was later field tested as being positive for the presence of heroin by Agent #1. All items recovered from the trash bag are conducive to trafficking in heroin. Through your Affiant's training and experience, the large wax papers are used to wrap "bricks" of narcotics, specifically heroin, then wrapped in aluminum foil, and finally placed in Ziploc bags for distribution.

5. On November 19, 2014, Agent #1 and Agent #3, of the Anti-Crime Unit, conducted surveillance at 4635 Portofino Way, unit 112, from their unmarked police vehicle. During that time, they observed a thin black male, wearing a red/gray shirt, exiting the target location and discarding a white trash bag into the trash bin next to the door. The male then walked back inside unit 112, closing the door behind him. Several minutes later, Agent #1 walked up to unit 112 and retrieved the same white trash bag out of the trash bin and walked

directly back to his vehicle. This bag was sealed in a knot with a red string, not allowing any of the contents to be removed. Agents 1 and 3 then drove to a secure location to view the contents from within. At that location, Agent #1 opened the top knot of the trash bag and began looking through the contents.

6.   The items recovered from the bag are as follows: (1) aluminum baking pan with suspected heroin residue, (1) one plastic baggie with tobacco and suspected marijuana residue, (1) one Walmart receipt and (1) one true religion clothing tag for a XXXL shirt. Both suspected residues were later field tested as being positive for the presence of heroin and marijuana. The Walmart receipt contained purchases of the aluminum baking pans, a blender, and vacuum sealable plastic baggies, which occurred on November 18, 2014. Agent #1 processed the aluminum baking pan with the suspected heroin residue and was able to lift several prints which were later turned over to Crime Scene Investigation (CSI) for further examination. On November 25, 2014, Agent #s was notified by CSI that the fingerprints were a positive match to Terry Dewayne TAYLOR. Agent #1 went to the Walmart store located at 4225 45th Street, West Palm Beach, Florida, and obtained a copy of the video surveillance which occurred on November 18, 2014. Upon reviewing the footage, Agent #1 clearly observed TAYLOR as the person purchasing the blender, the aluminum baking pans, and the vacuum sealable plastic bags. Agents later recovered what is believed to be the same blender during the execution of a federal search warrant at 4635 Portofino Way, unit 112, West Palm Beach, FL (believed to be TAYLOR's stash house), which resulted in the seizure of a large quantity of heroin, and a number of weapons.

7.   On January 2nd, 2015, at approximately 6:00 p.m., Agent #1 met up with Agent #3 for the purpose of conducting a third trash pull from 4635 Portofino Way, unit 112. Agent

3

#1 drove up and dropped off Agent #3 near unit 112. Agent #3 walked up and retrieved one white trash bag out of unit 112's trash bin, and then walked directly back to Agent #1's vehicle. This bag was sealed in a knot with a red string, not allowing any of the contents to be removed. Agents 1 and 3 then drove to a secure location to view the contents from within the bag. At that location, Agent #1 opened the top knot of the trash bag and began looking through the contents. The items recovered from the bag are as follows: (1) one medium Ziploc bag with suspected heroin residue, (1) one wax paper sheet, (2) two smaller Ziploc bags with suspected heroin residue, (1) one aluminum baking pan, (1) one piece of plastic (vinyl) with suspected heroin residue, (1) one crumbled aluminum foil and (1) one receipt. All suspected heroin residues in the above listed items were later field tested as being positive for the presence of heroin by Agent #1.

8. On February 19, 2015, at approximately 4:00 p.m., Agent #3 met with Agent #4 for the purpose of conducting a fourth trash pull at 4635 Portofino Way, unit 112. Upon arrival, Agent #3 dropped off Agent #4 near unit 112. Agent #4 walked up and retrieved one white trash bag out of unit 112's trash bin and then walked directly back to Agent #3's vehicle. This bag was sealed in a knot with a red string, not allowing any of the contents to be removed. Agents #3 and #4 then drove to a secure location to view the contents from within. At that location, Agent #3 opened the top knot of the trash bag and began looking through the contents. The items recovered from the bag are as follows: (2) two Ziploc bags (top portion only) with suspected heroin residue inside, (1) one wax paper sheet with suspected heroin residue and (1) one aluminum paper sheet with suspected heroin residue. All suspected heroin residues in the above listed items were later field tested as being positive for the presence of heroin by Agent #3.

9. All evidentiary items found during the four trash pulls were photographed and submitted into evidence by agents from the WPBPD's Anti-Crime Unit.

10. It should be noted that during the months of November 2014 through February 2015, Agent #1 developed a confidential informant, hereinafter referred to as CI, for informational purposes. During that time period, the CI would relay pertinent information to Agent #1 pertaining to TAYLOR's drug trafficking activities. According to the CI, TAYLOR had two (2) to three (3) males at 4635 Portofino Way, unit 112, at any given time and would assist in watching the "stash house" for TAYLOR. These males would also package the heroin into ounces or capsules after it was mixed into a blender. Two of the males would package the heroin and the other male would be a "lookout." The most heroin the CI had seen inside 4635 Portofino Way, unit 112, at any given time was approximately two (2) kilograms. The CI also observed six (6) to seven (7) handguns in plain view during several of his/her visits. According to the CI, these firearms were sitting on tables alongside the heroin and on the kitchen counters in plain view. During one of the visits, the CI claimed to have observed a large black safe inside one of the bedrooms. The CI informed Agent #1 that the safe is approximately 4 feet tall and contains TAYLOR'S drug proceeds along with jewelry and additional firearms. The CI stated that TAYLOR would pick up and drop off narcotics and proceeds to and from the 4635 Portofino Way, unit 112, and would also supervise the various aspects of the drug operation. The CI stated that TAYLOR does not sleep at the Target Location. The CI was a former user of narcotics who had been previously been provided narcotics by TAYLOR. The CI was then facing state charges for a minor non-drug related offense. The charges were later dropped for reasons unrelated to his/her cooperation, and the CI never provided any further information against TAYLOR or anyone else. [Note: during a

June 2015 federal search warrant of this same address, agents found narcotics and weapons but no safe].

11. Since February 2013, members of the Drug Enforcement Administration (DEA), West Palm Beach District Office (WPBDO), Task Force Group, have conducted an investigation of a large-scale drug trafficking organization in Palm Beach County, Florida. This DTO is responsible for trafficking in large quantities of heroin, fentanyl and cocaine. This DTO operates in the Southern District of Florida, specifically in Palm Beach County, Florida, and in New York metropolitan area, New York. During the course of this ongoing investigation, law enforcement developed a cooperating defendant, hereinafter referred to as CD-1. CD-1 was a member of this DTO and was responsible for "cutting" the heroin and fentanyl, which is common street terminology for the mixing of illegal drugs with other inexpensive agents, and/or adulterants, to increase the quantity available for sale and thereby increase the profits. In debriefings with law enforcement, the CD-1 fully admitted the nature and breadth of his/her role in this DTO and identified his/her co-conspirators and their respective roles. CD-1 is working with law enforcement in the hopes of reducing his liability for his/her role in the DTO. CD-1 worked with law enforcement from approximately October of 2013 until approximately June of 2014 when he/she ceased all communications with law enforcement and fled to the Dominican Republic. CD-1 remained in the Dominican Republic until approximately October of 2014. Since that time CD-1 has resumed communications with law enforcement and has continued to cooperate with law enforcement through the present. During the periods of time during which CD-1 has cooperated with law enforcement, law enforcement has independently verified information provided by CD-1. As a result, I believe the information provided by CD-1 to be credible and reliable.

12. CD-1 advised law enforcement that TAYLOR has been one of thisDTO's heroin customers since 2012. CD-1 stated that since 2012, TAYLOR would purchase two (2) to three (3) kilograms of heroin every two (2) months from this DTO. Per CD-1, TAYLOR would be charged approximately $65,000.00 per kilogram and it would be provided to TAYLOR on consignment. CD-1 said that TAYLOR would pick up heroin from both the DTO's known locations, which are 790 Cresta Circle, West Palm Beach, Florida and 10719 Tamis Trail, Lake Worth, Florida.

13. According to CD-1, during early 2013, TAYLOR had given the leader of this DTO a 2012 champagne colored Nissan Maxima as payment for heroin that TAYLOR owed to the leader. CD-1 also advised that TAYLOR lived at 790 Cresta Circle, West Palm Beach, Florida and 10719 Tamis Trail, Lake Worth, Florida, at one point during 2014. The leader of the DTO allowed TAYLOR to stay at both residences during that time and Taylor assisted the DTO with its drug trafficking activities. CD-1 stated that TAYLOR had several "stash" locations set up within the City of West Palm Beach; however, CD-1 has never been to any stash location. According to CD-1, these stash locations were used to store TAYLOR's drugs, firearms and money in each of them.

14. During the months of November and December 2014, Affiant conducted several hours of surveillance at 10719 Tamis Trail, Lake Worth, Florida. On several different occasions Affiant observed a white Ram 3500 pickup truck, bearing Florida tag DJPB07, parked in the driveway of the residence. It was later learned through a records check of NCIC/FCIC that the truck was registered to Winn Capital, LLC; the same business listed as the registrant of other vehicles being driven by TAYLOR. On April 18, 2015, while working an off-duty overtime detail at "The Box," located 2223 Palm Beach Lakes Boulevard, West

Palm Beach, Florida, Affiant observed TAYLOR pulling up in the above listed truck and parking in front of the club. TAYLOR exited the driver's seat and entered the club. Affiant verified the license plate on the truck as being DJPB07. Shortly after, Affiant observed TAYLOR exiting the club and leaving in the white Ram 3500 pickup truck.

15. On May 7, 2015, at approximately 11:45 a.m., agents met with Agent #3 for the purpose of conducting a fifth trash pull at 4635 Portofino Way, unit 112, West Palm Beach, Florida. Upon arrival, Affiant and Agent #3 were dropped off near the 4635 Portofino Way, unit 112, West Palm Beach, Florida. Both Agents walked up and retrieved one white trash bag out of the 4635 Portofino Way, unit 112 trash bin and then walked directly back to the agent's vehicle. This bag was sealed in a knot with a red string, not allowing any of the contents to be removed. All three (3) Agents then drove to a secure location to view the contents from within the bag. At that location, Agents opened the top knot of the trash bag and began looking through the contents. The items recovered from the bag are as follows: (1) one Ziploc bag containing loose suspected marijuana, (1) one burned suspected marijuana cigar, (2) two correspondences containing TAYLOR's name, business cards in the name of Terry Thomas, VP for A & J Wise Consulting, Inc., (1) correspondence containing Markland Anderson's name and (1) correspondence containing Joseph Scott's name. Both the cigar and the loose marijuana were later field tested as being positive for the presence of THC, the active ingredient in marijuana by law enforcement. Note that during the time of the trash pull, Agents observed a white Infiniti Q80 SUV, bearing Florida license plate CUWK93, parked in front of 4635 Portofino Way, unit 112, West Palm Beach, Florida. Agents later learned through a records check in NCIC/FCIC that the Infiniti was registered to Winn Capital, LLC.

16. On June 4, 2015, agents executed a federal search warrant for narcotics and weapons at 4635 Portofino Way, unit 112, West Palm Beach, Florida. During the execution of the search warrant, agents located a black male in the northeast (master) bedroom on the bed, subsequently positively identified as Markland ANDERSON. Underneath the mattress where ANDERSON was observed lying, agents recovered a Norinco rifle, commonly known as an AK-47 (manufactured in China) and a Century Arms rifle (manufactured in Vermont). Adjacent to the bed, agents located a Glock semi-automatic pistol, .40 caliber, (manufactured in Austria), with an extended magazine of ammunition.

17. In the master bedroom dresser, agents located multiple baggies of suspected brown and black heroin in plastic bags. These substances later field-tested positive for the presence of heroin. In the same dresser drawer where the heroin was found, agents located two (2) prescriptions (one bottle and one box) with the name, "Terry TAYLOR" imprinted on them.

18. In the southeast bedroom, agents located a hydraulic compressor ("kilo-press") which contained approximately one (1) kilogram of suspected heroin. This substance was also field-tested positive for the presence of heroin.

19. In the kitchen area, agents observed and seized multiple plastic baggies containing suspected heroin, which later field tested positive for the presence of heroin. Agents also located multiple empty tiny blue plastic baggies and empty clear plastic capsules, each of which are consistent with packaging materials commonly used in street sales of heroin and other controlled substances.

20. In the living room area, agents seized numerous photographs of ANDERSON and TAYLOR with other persons and evidence of airline travel in the name of TAYLOR to Nassau, Bahamas and Costa Rica.

21. All heroin seized during the entire search amounted to approximately 2.7 kilograms.

22. In connection with the investigation, agents conducted a criminal record check for TAYLOR and discovered that prior to June 4, 2015; TAYLOR had been previously convicted of a felony offense relating to weapons.

23. On June 4, 2015, at approximately 7:00 p.m., law enforcement conducted a debriefing of a second cooperating defendant, hereinafter referred to as CD-2, at an undisclosed location, in regards to TAYLOR's drug trafficking activities.

24. CD-2 advised that he/she met TAYLOR through Daniel DELGADO in late 2012. In early 2014, TAYLOR began renting out the residence, located at 10719 Tamis Trail, Lake Worth, Florida, for $3,000.00 per month. During that time, TAYLOR began purchasing kilogram quantities of heroin from CD-2. CD-2 stated that TAYLOR would purchase approximately two (2) to three (3) kilograms of heroin a month, for $60,000.00 per kilogram for white powder heroin ("China White") and $40,000.00 for black tar heroin. Within the past year, TAYLOR had purchased approximately 20 kilograms of heroin (comprised of a mixture of white powder and black tar heroin) from CD-2.

25. CD-2 advised that he/she would provide TAYLOR the heroin on consignment and that TAYLOR would pay CD-2 for the heroin in increments of $20,000.00 to $40,000.00 in couple of weeks. During all of the heroin drug transactions, CD-2 would

only meet TAYLOR at 10719 Tamis Trail, Lake Worth, Florida or 630-A Sea Pine Way, Greenacres, Florida.

26. CD-2 said that he/she has met TAYLOR in Las Vegas, Nevada, on two (2) separate occasions and introduced TAYLOR to Zenaido PARRA-Chaidez (a/k/a: "TIO"). CD-2 advised that PARRA-Chaidez and another person were his/her source of supply for drugs, originating from California. On those occasions, CD-2 ordered multiple kilograms of heroin from "TIO" and this other person which were subsequently purchased by TAYLOR for street-level distribution in Palm Beach County, Florida.

27. CD-2 identified that TAYLOR drives multiple vehicles; specifically, a "big" white pickup truck, a black Range Rover, a black Chrysler 300 and a white Infiniti SUV. CD-2 explained to agents that TAYLOR was always alone during the drug transaction with CD-2.

28. On June 5, 2015, at approximately 12:20 p.m., law enforcement conducted another debriefing of CD-2, relating to TAYLOR's drug trafficking activities. During this debriefing, CD-2 advised both agents that sometime in late March and/or early April, 2015, CD-2 provided TAYLOR with one (1) kilogram of black tar heroin and one (1) kilogram of white powder heroin. The aforementioned heroin was provided to TAYLOR on consignment. Several weeks later, after TAYLOR paid CD-2 for both kilograms of heroin, CD-2 provided TAYLOR another kilogram of black tar heroin, which was also given on consignment. In early May of 2015, CD-2 provided TAYLOR with two (2) additional kilograms of heroin, comprised of white powder heroin. During all the meetings, TAYLOR met with CD-2 at 630-A Sea Pine Way, Lake Worth, Florida. During one occasion, CD-2 observed TAYLOR arrive at the meeting driving in a black Chrysler 300. In total, CD-2

provided TAYLOR with five (5) kilograms of heroin (3- white powder and 2- black tar) from late March to early May of 2015.

29. CD-2 stated that during the week of May 26, 2015, CD-2 purchased two (2) black AT&T cellular telephones from a H2O store, located at 400 South Dixie Highway, Lake Worth, Florida. CD-2 gave TAYLOR one of the cell phones, with the assigned telephone number of 407-496-6429. CD-2 kept the other cellular telephone, with the assigned number of 786-239-8253. CD-2 advised that he/she would provide TAYLOR with disposable telephones, used solely to conduct drug transactions. CD-2 also explained that by providing TAYLOR with the cellular telephone, it would separate the contact information with CD-2 and TAYLOR's personal and lower level drug transaction conversations. CD-2 said that the last telephonic contact with TAYLOR on above listed cell phone occurred on June 3, 2015, at approximately 6:00 p.m. Affiant verified this information by reviewing the recent calls lists of CD-2's cellular telephone, which corroborated CD-2's information.

30. During that same debriefing, Affiant provided CD-2 with a photographic lineup depicting six (6) individual of similar resemblance; one being TAYLOR. TAYLOR's photograph was randomly placed in position number 6, which was located at the lower right section of the lineup. Affiant provided CD-2 instructions prior to showing the aforementioned photo lineup, indicating that TAYLOR's photograph may or may not be listed in the photo lineup. CD-2 was instructed to circle the photo, along with signing and writing the date of TAYLOR's photo; which was completed by CD-2, as witnessed by another agent. Affiant also asked CD-2 to point out which photo, if any, belonged to TAYLOR. Upon display of the photo lineup, CD-2 immediately pointed to the photo number 6 photo, positively identifying TAYLOR.

31. Based on the foregoing, your affiant respectfully submits that there is probable cause to charge Terry TAYLOR, aka Terry Thomas, with violations of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A) and 846 (Possession And Conspiracy to Possess with Intent to Distribute controlled substances.

FURTHER YOUR AFFIANT SAITH NAUGHT.

_____
CHRISTIAN MALTA
TASK FORCE OFFICER
U.S. DRUG ENFORCEMENT ADMINISTRATION

SWORN TO AND SUBSCRIBED BEFORE
ME THIS 9th DAY OF JUNE, 2015, IN
WEST PALM BEACH, FLORIDA.

_____
HON. DAVE LEE BRANNON
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No.   15-8310-DLB

IN RE:

SEALED CRIMINAL COMPLAINT
_____/

CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?   _____ Yes   __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?   _____ Yes   __X__ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY: /s/ Stephen Carlton
STEPHEN CARLTON
ASSISTANT UNITED STATES ATTORNEY
Admin No. A5500011
500 S. Australian Avenue, Suite 400
West Palm Beach, FL 33401-6235
Tel: (561) 820-8711
Fax: (561) 820-8777
Stephen.Carlton@usdoj.gov